### SCOTT et al. v. EPPERSON et al.

No. 18811. Opinion Filed Jan. 7, 1930.

Commissioners' Opinion, Division No. 2.

Orr & Woodford, for plaintiffs in error.

Park Wyatt, for defendant in error A. B. Epperson.

JEFFREY, C. Lillian, Moses, Norah, Willmott and Tiger Scott, as plaintiffs below, filed their petition against A. B. Epperson, Herman Shephard, J. C. Fore, O. Brixley, M. F. Mainard, Jr., Doss-McAlester Royalty Company, F. G. Searight, W. A. Mason, R. H. Todd, G. E. Rogers, Mrs. Charles Malone, J. W. Dana, Tecumseh National Bank, and Equitable Farm Mortgage Company, in which they ask for possession of an undivided one-third interest in the S.½ of the N. E. ¼ of section 33, township 10 north, range 6 east in Seminole county, Okla., and to have canceled certain instruments of conveyance affecting the title to said interest in the land. The petition alleged that Lucy Grayson, an adopted citizen of the Seminole Tribe of Indians and enrolled opposite Roll No. 1530, was originally allotted the above described 80 acres of land as her surplus allotment of the Seminole tribal lands; that she was of one-fourth negro blood; that, on December 18, 1903, she and James Scott, a full-blood Creek Indian, both being residents of what was then Indian Territory, procured a marriage license, and entered into a ceremonial marriage; that they lived together as husband and wife until death of Lucy Grayson in 1916; and that of said pretended marriage these plaintiffs are the only sons and daughters. The petition further alleges that upon the death of Lucy Grayson, James Scott, as her pretended heir at law, conveyed an undivided one-third interest in and to said land, which was later approved by the probate court having jurisdiction of the settlement of her estate. The petition further alleges the pretended marriage between Lucy Grayson and James Scott was illegal and void, and that plaintiffs were the sole heirs of said Lucy Grayson, and were entitled to take the entire interest in and to said land. The interest of all defendants appears to depend upon the validity of the conveyance by James Scott. The several defendants filed general demurrers to the petition, which were by the court sustained. Plaintiffs elected to stand upon the petition, and the same was by the court dismissed. From the order dismissing the petition, plaintiffs have appealed, and here complain of the court's ruling on the demurrers.

The right of James Scott to inherit an undivided one-third interest in the land upon the death of Lucy Grayson can only be sustained by reason of a lawful relation of husband and wife existing between them at the time of the death of Lucy Grayson. This is the only question presented by this appeal. It is contended by counsel for plaintiffs that by reason of the fact that James Scott, under the Constitution and laws of this state, was a white man, and Lucy Grayson a negro, the relation of husband and wife could not be maintained, and that James Scott could not inherit upon her death.

Since Mansfield's Digest of the Laws of Arkansas was in force over the Indian Territory, by reason of the Curtis Act of 1898, at the time of marriage between the parties, we think it proper to first determine whether or not there were any inhibitions against the marriage at that time in the place of their domicile. The particular provision governing marriage between the races in the Indian Territory in 1903 was section 4593 of chapter 103, Mansfield's Digest of the Laws of Arkansas, which is as follows:

"All marriages of white persons with negroes or mulattoes are declared to be illegal and void."

The question then is, does the expression "white persons" include a full-blood member of the Creek Tribe of Indians? When the above provision of the statutes was adopted by the Legislature of Arkansas, there were no Indian tribes domiciled within the state of Arkansas, and there was no occasion to classify them or to adopt legislation relative to them. It could hardly be said that the Legislature of Arkansas had in mind the matter of controlling the domestic relations of a class or race of people who were not inhabitants of that state. Indians were and are generally referred to

as such, or as red men. We cannot presume that they are included within the term "white persons," but must presume that the expression was used in its ordinary acceptation, which, according to the lexicographers, means persons having a light complexion, as members of the Caucasian race; opposed to negro, also the red, yellow and brown races. We are of the opinion that there was no inhibition against the marriage of Lucy Grayson, who was of African descent, and James Scott, a full-blood Indian, in the Indian Territory in 1903; and that the marriage between them was a valid subsisting marriage upon the advent of statehood.

But it is contended that even though James Scott and Lucy Grayson were legally married in 1903, the marriage relation could not be maintained between them after statehood by reason of the applicable provisions of the statutes and Constitution, which were put in force over the Indian Territory at statehood. Section 11 of art. 23 of the Constitution provides that the words, "colored, colored race, negroes or negro race," as used in the Constitution and laws of this state, shall be construed to mean or apply to all persons of African descent; and that the term "white race" shall include all other persons. By reason of the foregoing constitutional provision, the members of the various Indian tribes are classed as members of the white race. Section 7499, C. O. S. 1921, provides as follows:

"Miscegenation Prohibited. The marriage of any person of African descent, as defined by the Constitution of this state, to any person not of African descent, or the marriage of any person not of African descent to any person of African descent shall be unlawful and is hereby prohibited within this state."

Section 7500, C. O. S. 1921, provides as a penalty for the violation of the preceding section a fine and imprisonment in the penitentiary. There can be no doubt that marriage between members of the Indian race and the negro race subsequent to statehood is prohibited by the foregoing provision. The only question contended for is that the purpose and intent of the act was to prohibit persons classified as whites from maintaining the marriage relation with persons of African descent, and the act rendered all existing marriages null and void. The substance of the argument made is that the act is not only an inhibition against such marriages subsequent to its adoption, but operated as a general annulment act.

In the case of Minor et al. v. Young et al., 149 La. 583, 89 So. 757, this question received consideration. In 1894 the Legislature of Louisiana passed Act No. 54, which prohibited marriage between blacks and whites and declared that such marriages should be null and void. A marriage relation entered into between a member of the black race and one of the white race prior to the adoption of the act was held to be a valid marriage notwithstanding the act. The applicable paragraph of the syllabus is as follows:

"Act No. 54 of 1894 prohibiting marriage between blacks and whites, relates to future marriages, and would not disturb a marriage status legally existing at the time of its passage."

In the case of Illinois Land & Loan Co. v. Wm. R. Bonner, 75 Ill. 315, the Supreme Court of Illinois construed a similar statutory provision of the state of North Carolina prohibiting marriage between white persons and Indians, and fixing a penalty for the violation thereof. One of the parties was an Indian and the other a white person, and the marriage occurred in North Carolina only a few years before the adoption of the statute. The pertinent part of the syllabus of that case is as follows:

"A statute prohibiting the intermarriage of a white person with an Indian, enacted after such marriage, will have no bearing upon the validity of the marriage."

The foregoing authorities impress us as being sound and wholesome. We are of the opinion that section 7499 was never intended as an annulment act, but as to those domiciled within the state, it was merely intended to prohibit future marriages between such persons.

It is argued by counsel that section 7499 is a positive declaration of the public policy of this state for the protection of the morals and society against serious social evils, and in order to give full effect thereto, it must be construed so as to destroy all such marriage relations existing at the time of the adoption of the act. We agree that the statute is a declaration of the policy of the state to protect society against social evils usually resulting from such amalgamations. And though the case is not before us, we believe it is the policy of our law to prevent the maintaining of the marriage relation between those of African descent and those not of African descent, who did not maintain that relation within the territorial confines of what is now Oklahoma, prior to the adoption of the act. But the parties to this marriage were legally

permitted to enter into the marriage in the Indian Territory. They did not then bring into this state an institution disfavored by a declared policy. They remained where they were domiciled, as many others did, and had a right to do. The law of their domicile was changed.

We are cognizant of the fact that marriage is a civil status, in which the state is vitally interested. It is also recognized by this court that the state of the domicile of the parties being interested in the marriage status to be created has a right to determine, by legislative enactment, the competency of the parties to enter into the marriage relation. Acts have been adopted in many of the American states prohibiting marriage between members of the white race and persons of African descent, and have been universally upheld as constitutional and valid. The wisdom of such acts prohibiting future marriage between such persons has also received the approbation of some of the most respectable courts of the land. It is said that the amalgamation of the white and black races is productive of deplorable results, but an act designed to wipe out, by the wholesale, legal, existing marriages between members of the white and black races would be almost profligate in its tendency, and productive of more deplorable results. We would be unwilling to say that the Legislature intended to destroy legal relations, such as that of marriage which had already become fixed, in the absence of plain and unmistakable language to that effect in the act. No such language as would justify the application of the section to marriages existing at the time of its adoption, is to be found in the act, and we hold that as to persons domiciled within the state, it has application only to marriages between members of the white race and persons of African descent, subsequent to the adoption of the act.

Counsel cites numerous authorities to the effect that persons, who are prohibited by the laws of their domicile from marrying, cannot evade such laws by marrying in other jurisdictions and maintain the marriage relation in the state of their domicile. This court is committed to that doctrine, but it affords no precedent on the question here under consideration. The judgment of the trial court is therefore affirmed.

BENNETT, HERR, DIFFENDAFFER, and HALL, Commissioners, concur.

By the Court: It is so ordered.

Note.—See "Marriage," 38 C. J. § 28, p. 1291, n. 35, 38.